THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| JOHN T. MILLER,<br><br>Plaintiff,<br><br>v.<br><br>GABRIEL POWER, et al.,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART [80] MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:20-cv-00210-DBB<br><br>District Judge David Barlow |

Former inmate John T. Miller ("Plaintiff") asserts five claims in his Amended Complaint against Defendants Dr. Power, PA Crockett, Nurse Lee, Nurse Baker, PA Merrill, and the Utah Department of Corrections ("UDC") related to medical care Plaintiff received while incarcerated at the Draper Correctional Facility ("DCF").[1] Plaintiff alleges that PA Crockett, Dr. Power, Nurse Baker, and PA Merrill violated his federal constitutional rights by denying him adequate medical care (Claims One and Three).[2] Plaintiff also alleges that PA Crockett, Dr. Power, Nurse Baker, PA Merrill, and UDC violated Utah state constitutional protections as a result of providing this alleged inadequate medical care (Claims Two and Four).[3] Finally, Plaintiff alleges that Nurse Lee, Nurse Baker, and PA Merrill retaliated against him for his use of the grievance process in violation of federal protections cognizable under 42 U.S.C § 1983 (Claim Five).[4]

On July 18, 2024, Defendants filed a motion for summary judgment on all claims.[5] On September 3, 2024, Plaintiff filed an opposition, in which Plaintiff conceded to the dismissal of PA Merrill and Nurse Lee but opposed summary judgment as to the remaining Defendants.[6]

---

[1] Am. Compl., ECF No. 34, filed August 22, 2021.
[2] *Id.* ¶¶ 117–23, 133–41.
[3] *Id.* ¶¶ 124–32, 142–49.
[4] *Id.* ¶¶ 150–61.
[5] Defs.' Mot. for Summ. J. ("Defs.' MSJ"), ECF No. 80, filed July 18, 2024.
[6] Pl.'s Opp'n to Defs.' MSJ ("Pl.'s Opp'n to MSJ") 4, ECF No. 91, filed September 3, 2024.

Accordingly, the court does not consider the claims against these two Defendants and grants Defendants' motion as to PA Merrill and Nurse Lee.[7] On March 13, 2025, Defendants filed their reply.[8]

Defendants also filed a motion in limine to exclude Plaintiff's Expert, Dr. Zawitz.[9]

For the foregoing reasons, the court grants in part and denies in part Defendants' motion for summary judgment.

## BACKGROUND[10]

*Foot Infection*

On July 17, 2018, Plaintiff went to the Intermountain Medical Center Emergency Department because of a small sore near his right pinky toe.[11] An infection workup confirmed a diabetic wound infection and severe sepsis, among other diagnoses.[12] Medical doctors placed Plaintiff on IV antibiotics, removed the unhealthy tissue from the sore, and prescribed a 7-day dose of amoxicillin (an antibiotic).[13] Prior to this visit, Plaintiff had been diagnosed with oral thrush, high cholesterol, high blood pressure, diabetes, Charcot foot in his left foot, and hemiplegic migraines.[14]

While at the hospital, Plaintiff was detained by the South Salt Lake Police and discharged into their custody the following day.[15] The Salt Lake County Jail began administering

---

[7] *See Hinsdale v. City of Liberal,* 19 F. App'x 749, 768–69 (10th Cir. 2001) (affirming grant of summary judgment where opposing party failed to address the claim in response to summary judgment).

[8] Defs.' Reply in Support of Defs.' MSJ ("Defs.' MSJ Reply"), ECF No. 100, filed March 13, 2025.

[9] Defs.' Mot. in Limine to Exclude Dr. Zawitz, ECF No. 89, filed September 3, 2024. Dr. Zawitz' testimony, if admitted, would have no effect on the court's resolution of the summary judgment motion. Therefore, the court denies the motion to exclude Dr. Zawitz as moot with leave to refile if the case proceeds to trial.

[10] The court views the evidence and draws reasonable inferences therefrom in the light most favorable to the Plaintiff. *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1182 (10th Cir. 2003).

[11] Miller Dep. 36:11–40:7; IMC Medical Records 23–27, ECF No. 82-1 (filed under seal).

[12] IMC Medical Records 2, 6 (filed under seal).

[13] *Id.* at 2, 5, 43,

[14] Miller Dep. 9:6–13:3, 25:25–28:23, 34:15–35:6; UDC Medical Records 364–65, ECF No. 82-3, filed July 31, 2024; IMC Medical Records 2, 15–17; Crockett Dep. 17:15–18:6.

[15] *Id.* at 2; Miller Dep. 42:4–14.

amoxicillin on July 19 through the afternoon of July 23.[16] On July 23, 2018, Plaintiff was transferred from the Jail to the state prison.[17] Upon arrival, a nurse provided Plaintiff an intake screening, during which the nurse recorded that Plaintiff was on amoxicillin, had sores and a diabetic ulcer on his right foot, and was hospitalized seven days prior.[18]

*Physical with PA Crockett*

The Prison's policy requires a qualified health professional to perform a physical examination, which includes a personal health history made up of illnesses and hospitalizations, medications, body system review, all current intake screening data, and further testing therapies as determined necessary.[19] PA Crockett was responsible for performing the physical examination on Plaintiff.[20] On July 26, 2018, PA Crockett saw Plaintiff for the physical examination[21] but did not enter his cell.[22] PA Crockett initially asked if Plaintiff would waive his physical examination.[23] Plaintiff declined to do so because he had "too many things going on with him," including "problems with both of my feet."[24] Plaintiff told PA Crockett he had a pressure sore right below his pinky toe that "was hurting and felt like it still needed to be treated," he had been to the hospital recently where he was given antibiotics, and he was taking antibiotics due to the pressure sore on his foot.[25] Plaintiff also showed PA Crockett his feet.[26]

PA Crockett asked Plaintiff what type of antibiotic he was on and about the nature of the sore.[27] PA Crockett's note from the physical examination states Miller "was recently on

---

[16] SLCo Jail Medical Records 1, ECF No. 82-2, filed July 31, 2024.
[17] Miller Dep. 45:17–46:2; UDC Medical Records 377.
[18] UDC Medical Records 378–79.
[19] UDC Policy 3396–97, ECF No. 88-2, filed August 30, 2024.
[20] Crockett Dep. 16:20–22.
[21] Miller Dep. 61–62.
[22] Crockett Dep. 24:19–20.
[23] Miller Dep. 131:2–5.
[24] *Id.* at 131:2–7.
[25] *Id.* at 60:1–16; 131:9–25.
[26] *Id.* at 131:11–12.
[27] *Id.* at 132:1–9, 132:20–25.

antibiotics for a stay in the hospital he states before coming into prison."[28] PA Crockett did not assess the sore or order antibiotics.[29] PA Crockett stated that if he was aware that Plaintiff had an active antibiotic prescription, the proper course would be to continue it, in part because "[s]topping short an antibiotic can cause a recurrence of infection."[30] Similarly, PA Crockett stated that if he was aware that Plaintiff had a foot infection, the proper course would be to physically examine it.[31]

*Dr. Power's Treatment*

On July 28, 2018, Plaintiff submitted an Inmate Care Request ("ICR") stating he needed to be seen by a doctor for "diabetic foot problems charcot foot."[32] On July 31, 2018, Plaintiff submitted another ICR, which stated "[h]e is getting concerned with his foot issue. [Inmate] has a foot sore that had a dressing change at county but here nothing ordered."[33] That same day, Plaintiff submitted a second ICR stating "I need to please by seen by a doctor for my diabetic foot problems charcot foot."[34] On August 1, 2018, Plaintiff submitted another ICR stating "I need to see a Dr. ASAP. I have a bad sore on my right foot that very painful + red. I am diabetic so this really need to be seen. I also have broken bones in my left foot from charcot."[35]

On August 3, 2018, Dr. Power saw Plaintiff for his foot sore.[36] Dr. Power found an "open wound" that looked infected.[37] Dr. Power was surprised it was the first time Plaintiff had been seen by a physician because the sore looked "old and advanced," "lacking recent dressings,

---

[28] UDC Medical Records 365.
[29] Crockett Dep. 19:9–12; 37:19–38:5. PA Crockett maintains that Plaintiff never told him about the pressure sore or that he was currently taking antibiotics for its treatment. Crockett Dep. 36:18–38:5. But at this stage, the court views the evidence in the light most favorable to the Plaintiff.
[30] Crockett Dep. 25:2–12.
[31] *Id.* at 33:10–13.
[32] ICR Requests 1565, ECF No. 82-4, filed July 31, 2024.
[33] *Id.* at 1563.
[34] *Id.* at 1562.
[35] *Id.* at 1561.
[36] UDC Medical Records 332.
[37] Power Dep. 20:8–21:1.

recent cleanings" and presented with "an odor that was strong."[38] Dr. Power removed "sore, necrotic material or dead tissue" from the sore, cleansed it, applied an antibiotic, and redressed the sore.[39] Dr. Power "intended to prescribe an antibiotic after [the] encounter that day, as well as dressing changes."[40] Dr. Power told Plaintiff that he should be able to pick up the antibiotics at the evening pill line.[41]

Dr. Power stated that in general, delaying an antibiotic could result in the "progression of an infected wound or a deterioration of the patient's overall condition."[42] Dr. Power, however, did not order antibiotics or dressing changes.[43] Dr. Power does not have a clear recollection of why he did not enter a prescription for antibiotics into UDC's electronic system but believes there may have been computer issues that prevented it.[44] Between August 3 and August 5, Plaintiff repeatedly asked medical staff for his antibiotics but was told Dr. Power had not ordered them.[45]

*Plaintiff's Hospitalization*

On August 5, at 12:30 PM, Plaintiff visited with RN Jathan Bingham in the med room. RN Bingham noted Plaintiff's "right foot was . . . red and hot to the touch with pain radiating up to his calf."[46] At 3:30 PM, Plaintiff was found lying on the floor unconscious. His temperature was 103.2. He was then transferred to the University of Utah hospital.[47] At the hospital, Plaintiff required multiple surgeries on his foot, including the amputation of his pinky toe and the flesh on

---

[38] *Id.* at 19:11–21.
[39] *Id.* at 18:22–20:7.
[40] *Id.* at 25:21–26:2.
[41] Miller Dep. 66:20–67:2.
[42] Power Dep. 46:5–17.
[43] Power Dep. 33:11–21.
[44] *Id.*
[45] Miller Dep. 68:3–24.
[46] UDC Medical Records 327.
[47] *Id.*

the top of his foot.[48] Sometime on Sunday, August 5, 2018, Dr. Power "got back on [the system] again to make sure that these orders got placed . . . [but] at that time, he had seen another provider."[49]

*November 13, 2020 - Hemiplegic Migraine Discussion with Nurse Baker*

Plaintiff suffers from hemiplegic migraines.[50] "Hemiplegic migraine is a rare and serious type of migraine headache. Many of its symptoms mimic those common to stroke; for example, muscle weakness can be so extreme that it causes a temporary paralysis on one side of your body, which doctors call hemiplegia."[51]

On November 13, 2020, Plaintiff felt a hemiplegic migraine building. At about 6:15 AM, Plaintiff pressed the medical help button in his cell. Plaintiff pressed the call button a few minutes later because his headache continued to get worse.[52] Nurse Baker, who was working the morning pill line, visited Plaintiff's cell between 6:30 and 7:00 AM.[53] He did not enter the cell.[54] Plaintiff and his cellmate explained his condition, which the nurse's note referred to as "hemodynamic Migraine vs. Stroke."[55] Plaintiff stated that he told Nurse Baker he had been diagnosed with hemiplegic migraines and that he needed a Toradol shot.[56] Nurse Baker had never heard of this condition, but due to hearing the word "stroke," Nurse Baker began evaluating Plaintiff for typical symptoms, such as whether he was slurring his speech, if he was

---

[48] Miller Dep. 71:14–23.
[49] Power Dep. 43:5–15.
[50] Miller Dep. 25:25–28:23.
[51] WebMD, https://www.webmd.com/migraines-headaches/hemiplegic-migraine-headaches-symptoms-causes-treatments?src=RSS_PUBLIC&ecd=soc_tw_newsbot [https://perma.cc/48RN-T8HM].
[52] Miller Dep. 90:16–91:6.
[53] Miller Dep. 92:20–22.
[54] Baker Dep. 56:21–25.
[55] Nov. 13 Medical Records 2396, ECF No. 82-8, filed July 31, 2024; Baker Dep. 51:11–22.
[56] Miller Dep. 91:17–92:1, 92:23–93:6.

able to walk, hold a conversation, and being alert and oriented.[57] Nurse Baker concluded he was not having a stroke but rather experiencing a migraine.[58]

Nurse Baker, as an RN, is unable to prescribe medication—including a Toradol shot—and instead reordered Plaintiff's over-the-counter migraine medication.[59] Knowing it could take a few days for that order to be filled, Nurse Baker went to the pharmacy to get the medication and delivered it to Plaintiff in his cell at around 12:00 PM.[60] In this encounter, Plaintiff was initially slurring his speech but then began to speak normally.[61] Nurse Baker then submitted an ICR for Plaintiff to see a doctor and notified the charge nurse.[62]

Plaintiff interacted with an EMT later that afternoon for a blood test.[63] That EMT did not make any entries in Plaintiff's medical chart relating to a migraine or to stroke symptoms.[64] Plaintiff stated in his deposition that he had a hemiplegic migraine for a few days and had no use of the left side of his body.[65]

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[66] "[T]he moving party carries the initial burden of demonstrating a lack of genuine issue of material fact," and thereafter, "the burden shifts to the nonmoving party 'to set forth specific facts showing that there is a genuine issue for trial.'"[67] And when applying the Rule 56 standard,

---

[57] Baker Dep. 51:8–54:11.
[58] *Id.* at 51:8–53:14; Nov. 13 Medical Records 2396.
[59] Baker Dep. 53:21–54:5; Nov. 13 Medical Records 2396.
[60] Baker Dep. 53:21–54:5, 68:1–13, 73:3–17; Nov. 13 Medical Records 2396.
[61] Nov. 13 Medical Records 2396.
[62] Baker Dep. 55:18–19; Nov. 13 Medical Records 2396.
[63] Nov. 13 Medical Records 2399.
[64] *Id.*
[65] Miller Dep. 95:16–24.
[66] Fed. R. Civ. P. 56(a).
[67] *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015).

the court "view[s] the evidence and draw[s] reasonable inferences therefrom in the light most

favorable to the nonmoving party."[68]

## ANALYSIS

## I.    CLAIMS ONE AND THREE: DELIBERATE INDIFFERENCE

Plaintiff alleges that PA Crockett, Dr. Power, and Nurse Baker were deliberately

indifferent to his serious medical needs in violation of the Eighth Amendment of the

Constitution. Defendants argue that they are entitled to qualified immunity.

"The doctrine of qualified immunity protects government officials 'from liability for

civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known.'"[69] "Because qualified

immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost

if a case is erroneously permitted to go to trial.'"[70] The plaintiff's burden of persuasion is

accordingly heavy, "in large part because our qualified-immunity inquiry 'is designed to spare a

defendant not only unwarranted liability, but [also] unwarranted demands customarily imposed

upon those defending a long drawn-out lawsuit.'"[71]

"Thus, at summary judgment, [the court] must grant qualified immunity unless the

plaintiff can show (1) a reasonable jury could find facts supporting a violation of a constitutional

right, which (2) was clearly established at the time of the defendant's conduct."[72] Because the

evidence "will often be controverted," the court "ask[s] whether the conduct attributed to the

---

[68] *Davidson*, 337 F.3d at 1182.

[69] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[70] *Id.* (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)).

[71] *Quintana v. Santa Fe Cnty. Bd. of Commrs.*, 973 F.3d 1022, 1028 (10th Cir. 2020) (quoting *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)); *Est. of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) ("The plaintiff "bear[s] the ultimate burden of persuasion at trial to overcome qualified immunity by showing a violation of clearly established federal law.").

[72] *Est. of Booker*, 745 F.3d at 411; *Est. of Jensen by Jensen v. Clyde*, 989 F.3d 848, 854 (10th Cir. 2021) (citing *Ullery v. Bradley*, 949 F.3d 1282, 1289 (10th Cir. 2020)).

defendant . . . , which [is] supported by the record . . . , would still entitle the defendant to qualified immunity."[73] "Under this two-part test, 'immunity protects all but the plainly incompetent or those who knowingly violate the law.'"[74]

"If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing 'that there are no genuine issues of material fact and that [the defendant] is entitled to judgment as a matter of law.'"[75]

### A.    PA Crockett Is Not Entitled to Qualified Immunity

#### 1.  Constitutional Violation

Under the Eighth Amendment, prison officials "must provide humane conditions of confinement [and] ensure that inmates receive adequate food, clothing, shelter, and medical care."[76] When a prison official fails to ensure an inmate receives adequate medical care by being "'deliberate[ly] indifferen[t] to [the inmate's] serious medical needs,'" the inmate has a cause of action against the official.[77]

"A claim for deliberate indifference to serious medical needs has an objective and subjective element."[78] "The objective element considers whether the harm suffered was sufficiently serious."[79] "The subjective element asks whether [the defendant] 'knew [the plaintiff] faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it.'"[80]

---

[73] *Est. of Jensen*, 989 F.3d at 855 (citing *Behrens v. Pelletier*, 516 U.S. 299, 312–13 (1996)).

[74] *Ullery*, 949 F.3d at 1289 (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)).

[75] *Est. of Beauford v. Mesa Cnty., Colorado*, 35 F.4th 1248, 1261–62 (10th Cir. 2022) (quoting *Gutteridge v. Oklahoma*, 878 F.3d 1233, 1239 (10th Cir. 2018)).

[76] *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

[77] *Martinez*, 563 F.3d at 1088 (quoting *Est. of Hocker v. Walsh*, 22 F.3d 995, 998 (10th Cir. 1994)).

[78] *Est. of Jensen*, 989 F.3d at 859 (citing *Quintana v. Santa Fe Bd. of Comm'rs*, 973 F.3d 1022, 1028–29 (10th Cir. 2020)).

[79] *Id.*

[80] *Id.* (quoting *Quintana*, 973 F.3d at 1029).

a.   Objective Component

Under the objective component of deliberate indifference, a medical need is sufficiently serious "'if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"[81] "Delay in medical care only constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm."[82] The substantial harm requirement may be based on the inmate's "ultimate harm."[83]

Viewing the evidence in the light most favorable to Plaintiff, on July 26, 2018, the day of PA Crockett's physical examination, a reasonable jury could find that Plaintiff had an infected sore on his right foot below his pinky toe that was hurting and "felt like it needed to be treated," even after a recent visit to the hospital.[84] As a result of not receiving treatment from PA Crockett, ten days later, on August 5, 2018, Plaintiff was taken to the hospital after being found unconscious, and required multiple surgeries on his foot, including the amputation of his pinky toe and the flesh on the top of his foot.[85] An infection resulting in a person being rendered unconscious and requiring amputation is a sufficiently serious injury.[86]

b.   Subjective Component

Turning to the subjective prong, deliberate indifference requires that "the official *knows of* and *disregards* an excessive risk to inmate health or safety."[87] In other words, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of

---

[81] *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1136 (10th Cir. 2023) (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)).
[82] *Sealock*, 218 F.3d at 1209.
[83] *Paugh v. Uintah Cnty.*, 47 F.4th 1139, 1155 (10th Cir. 2022) (citing *Mata v. Saiz*, 427 F.3d 745, 754 (10th Cir. 2005) (explaining that an inmate's "ultimate harm, heart damage, would satisfy the objective component.")).
[84] Miller Dep. 131:17–25.
[85] Miller Dep. 71:14–23.
[86] *See Oxendine v. Kaplan*, 241 F.3d 1272, 1278 (10th Cir. 2001) (severed finger was sufficiently serious).
[87] *Farmer*, 511 U.S. at 837 (emphasis added).

serious harm exists, and he must also draw the inference."[88] This "'does not require a finding of express intent to harm,' nor must a plaintiff 'show that a prison official acted or failed to act believing that harm actually would befall an inmate.'"[89] Instead, the plaintiff may show that the prison official "consciously disregarded" a risk to the inmate's health or safety.[90]

The plaintiff may demonstrate the official's state of mind in "the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."[91] "The question is: 'were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?'"[92]

Therefore, the court examines whether Plaintiff has proffered sufficient evidence to support that: (i) PA Crockett knew there was a substantial risk to Plaintiff's health; and (ii) PA Crockett consciously disregarded that risk.

### i.    Knowledge of Substantial Risk

There are two relevant methods of using circumstantial evidence to prove the knowledge element—that the official *knows of* facts from which the inference could be drawn that a substantial risk of serious harm exists. First, knowledge "can be established when the risks would be obvious to a reasonable person."[93] Second, even if the risks would not have been obvious to a lay person, the plaintiff can establish that a medical professional would have recognized the

---

[88] *Id.*

[89] *Spencer v. Abbott*, 731 F. App'x 731, 742 (10th Cir. 2017) (unpublished) (quoting *Mitchell v. Maynard*, 80 F.3d 1433, 1442 (10th Cir. 1996); *Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005).

[90] *Spradley v. LeFlore Cnty. Det. Ctr. Pub. Tr. Bd.*, 764 F. App'x 692, 699 (10th Cir. 2019) (unpublished).

[91] *Farmer*, 511 U.S. at 842.

[92] *Martinez*, 563 F.3d at 1089 (quoting *Mata*, 427 F.3d at 753).

[93] *Est. of Jensen*, 989 F.3d at 859 (quoting *Mata*, 427 F.3d at 752); *Farmer*, 511 U.S. at 842 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").

inmate's symptoms as a potential medical emergency.[94] Because PA Crockett is a medical professional, the court focuses on the latter.

For a medical professional, the "need for medical treatment is 'obvious' when '[the professional is] presented with recognizable symptoms which potentially create a medical emergency.'"[95] If the recognizable symptoms require the medical professional to make a "referral or [administer] minimal diagnostic testing to confirm the symptoms,"[96] "[a]n official 'would not escape liability if the evidence showed that he merely . . . declined to confirm inferences of risk that he strongly suspected to exist.'"[97]

In *Sealock v. Colorado*,[98] a PA's actions met the subjective element when the PA testified that if he knew an inmate had unexplained chest pain, he would have directed the inmate to be sent to the hospital, and there was evidence that the PA had been told about the chest pain.[99] There, an inmate who was experiencing throbbing pressure in his chest visited the prison infirmary and told the nurse that "he had chest pain and couldn't breathe."[100] The nurse took notes about his symptoms and diagnosed him with the flu.[101] The nurse testified that she called the PA two hours later and read him the notes, including the part concerning the inmate's chest pain.[102] The PA testified that the nurse never mentioned the chest pain to him over the phone.[103] The PA then told the nurse to administer a shot of Phenergan, an antihistamine and antiemetic, and to order a 24-hour lay-in.[104] He later testified that, "if there's a nonexplained chest pain,

---

[94] *Quintana*, 973 F.3d at 1032 (quoting *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006)).
[95] *Id.* (quoting *Self*, 439 F.3d at 1232).
[96] *Self*, 439 F.3d at 1232.
[97] *Mata*, 427 F.3d at 752 (quoting *Farmer*, 511 U.S. at 843 n.8).
[98] 218 F.3d 1205 (10th Cir. 2000).
[99] *Id.* at 1211.
[100] *Id.* at 1208.
[101] *Id.*
[102] *Id.*
[103] *Id.*
[104] *Id.*

there's a standard thing we all do; that is, they should call the ambulance," and "[i]f I would have been told those words [chest pain], then, there's just one thing we do. . . . we send them."[105] Because the factfinder could credit the nurse's version of events—that she had told the PA about the inmate's chest pain—and then determine that the PA, "by his own testimony[, was] deliberately indifferent in failing to summon the ambulance," the Tenth Circuit denied summary judgment.[106]

Here,[107] Plaintiff states that he told PA Crockett that he had "problems with both of my feet,"[108] and a pressure sore right below his pinky toe that "was hurting and felt like it still needed to be treated."[109] Plaintiff further informed PA Crockett that he had been to the hospital recently where he was given antibiotics for the pressure sore on his foot.[110] PA Crockett also discussed Plaintiff's prescriptions, reviewed the nursing intake, and was aware that Plaintiff had diabetes.[111] Notably, Plaintiff has testified that he showed PA Crockett his feet.[112]

PA Crockett stated that if he was aware that Plaintiff had an active antibiotic prescription, the proper course would be to continue it, in part because "[s]topping short an antibiotic can cause a recurrence of infection."[113] Similarly, PA Crockett stated that if he was aware that Plaintiff had a foot infection, the proper course would be to physically examine it.[114]

Accordingly, a reasonable juror could conclude that PA Crockett knew of the sore on Plaintiff's foot and that it could result in substantial harm if left untreated based on the

---

[105] *Id.* at 1211 (second alteration in original).
[106] *Id.* at 1212.
[107] Again, at this stage, the court views the evidence in the light most favorable to Plaintiff. Assessing the credibility of Plaintiff and PA Crockett's description of events is a task reserved for the factfinder.
[108] Miller Dep. 131:2–7.
[109] *Id.* at 60:1–16; 131:9–25.
[110] *Id.* at 60:1–16; 131:9–25.
[111] Crockett Dep. 20:20–25, 34:8–23.
[112] Miller Dep. at 131:11–12.
[113] Crockett Dep. 25:2–12.
[114] *Id.* at 33:10–13.

combination of seeing the infected foot and the knowledge that Plaintiff is diabetic, went to the hospital recently regarding the foot, and was prescribed antibiotics at the hospital for the foot.

ii.    Disregard of Risk

"As to disregard, the plaintiff must demonstrate . . . that [the defendant] 'disregarded th[e] risk, by failing to take reasonable measures to abate it.'"[115] This failure to take reasonable measures "is assessed at the time of the alleged omission, [and a defendant's] eventual provision of medical care does not insulate [him] from liability."[116] While this element "arguably requires nothing more than an act (or omission) of indifference to a serious risk that is voluntary, not accidental,"[117] a responsive action that is merely negligent is not sufficient.

The Tenth Circuit has found that a medical professional entirely denied care despite the presence of recognizable symptoms of a potential medical emergency in prior cases. In *Mata v. Saiz*,[118] a "patient complain[ed] of chest pains and the prison official, knowing that medical protocol requires referral or minimal diagnostic testing to confirm the symptoms, sen[t] the inmate back to his cell."[119] In *Sealock*, discussed above, the PA was informed that a patient had chest pains and then ordered him a shot of Phenergan and a 24-hour lay-in.[120] The PA did this despite knowing that if a patient reports chest pains, the required action is sending the patient to the hospital.[121]

Here, there is a genuine dispute of material fact about whether PA Crockett was aware of the information revealing the obvious risk. PA Crockett is adamant that Plaintiff never showed his right foot or otherwise spoke of it. As a result, PA Crockett did not assess the sore or order

---

[115] *Spradley*, 764 F. App'x at 699 (quoting *Martinez*, 563 F.3d at 1089).
[116] *Est. of Booker*, 745 F.3d at 433.
[117] *Farmer*, 511 U.S. at 840.
[118] 427 F.3d 745 (2005).
[119] *Self*, 439 F.3d at 1232 (discussing *Mata*, 427 F.3d 745).
[120] 218 F.3d at 1208.
[121] *Id.*

antibiotics.[122] Nonetheless, a reasonable juror could credit Plaintiff's testimony. Therefore, Plaintiff has proffered sufficient evidence from which a jury could conclude that PA Crockett was deliberately indifferent to Plaintiff's serious medical needs.

### 2. *Clearly Established Law*

As to the second prong of qualified immunity, it is Plaintiff's burden to show that his rights in the circumstances were clearly established at the time of the alleged constitutional violation. Framing the analysis for clearly established law requires a "high degree of specificity."[123] The Supreme Court does not "require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."[124] The Supreme Court has repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced."[125] "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."[126]

Plaintiff cites to *Mata v. Saiz*,[127] for the broad proposition that "the right to reasonable medical care is a clearly established right."[128] However, as *Mata* makes clear, "[t]he relevant,

---

[122] Crockett Dep. 19:9–12; 37:19–38:5. PA Crockett maintains that Plaintiff never told him about the pressure sore or that he was currently taking antibiotics for its treatment. Crockett Dep. 36:18–38:5. But at this stage, the court views the evidence in the light most favorable to the Plaintiff.
[123] *District of Columbia v. Wesby*, 583 U.S. 48, 63–64, (2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 13 (2015) (per curiam)).
[124] *Mullenix v. Luna*, 577 U.S. at 12.
[125] *Wesby*, 583 U.S. at 63–64.
[126] *Mata v. Saiz*, 427 F.3d 745, 749 (10th Cir. 2005) (quoting *Holland v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001)).
[127] 427 F.3d at 749.
[128] Pl.'s Opp'n to MSJ 24.

dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*."[129]

In *Mata*, the Tenth Circuit found that three nurses were protected by qualified immunity and a fourth nurse was not. *Mata* involved an inmate who experienced severe chest pain over a three-day period culminating in a heart attack, which resulted in a permanent disability. When the inmate initially sought medical attention for severe chest pains on the evening of October 29, 2000, Nurse Weldon told her that "there was *nothing* she could do for her since the infirmary was closed."[130] When Mata reported to the infirmary the next morning, Nurse Quintana conducted an assessment, including an EKG, which she read as normal. Nurse Quintana told Mata that based on her experience Mata was not experiencing a heart attack. Quintana gave her a permission slip to miss work assignments for the day. Mata experienced persistent chest pains throughout the day, which she reported to prison guards, but did not return to the infirmary until the next morning. On the morning of October 31, Mata returned to the infirmary and Nurse Hough administered a second EKG, which she also read as normal, despite the fact that it showed changes from the previous day. Nurse Saiz soon arrived at the infirmary and performed an independent assessment. Saiz also thought the second EKG was normal but forwarded the results to a physician for review. The physician ordered Saiz to send Mata to the hospital "immediately."[131] Instead of immediately arranging transportation to the hospital, Nurse Saiz instructed Mata to walk back to her housing unit, approximately two blocks up hill, change her clothes and walk back to the infirmary.[132] When Mata was finally admitted to the hospital, hospital staff determined that she had suffered a heart attack sometime after Quintana's

---

[129] *Mata*, 427 F.3d at 749 (emphasis added).
[130] *Mata*, 427 U.S. at 755 (emphasis in original).
[131] *Id.* at 750.
[132] *Id.*

evaluation on October 30.[133] Despite surgery, Mata suffered irreversible heart damage and sustained a permanent disability.[134]

Mata sued the four nurses, alleging deliberate indifference to her serious medical needs. The district court ruled that Weldon, Quintana and Hough were fully protected by qualified immunity but found that Saiz was only protected for her actions prior to instructing Mata to return to the dormitory contrary to the doctor's order.

On appeal, the Tenth Circuit reversed the district court's ruling on Weldon. The Tenth Circuit held that Weldon was unprotected by qualified immunity because Mata had presented sufficient evidence to raise a dispute of material fact as to whether Weldon had acted with deliberate indifference in her role as a gatekeeper by "completely refus[ing] to assess or diagnose" Mata in a potential cardiac emergency.[135]

The Tenth Circuit also found that Saiz and Hough were fully protected by qualified immunity because they had fulfilled their roles as gatekeepers by notifying medical providers of Mata's symptoms in accordance with prison protocols. Notably, the Tenth Circuit extended qualified immunity to fully protect Nurse Saiz, despite her instructions to the plaintiff to walk back to the dormitory, delaying the doctor's orders while plaintiff was experiencing severe chest pain.

> Although Ms. Mata produced evidence that Ms. Saiz knew she was suffering severe chest pains and that severe chest pain posed a serious risk to Ms. Mata's health, Ms. Mata failed to show Ms. Saiz was deliberately indifferent to her serious medical needs. … Ms. Saiz fulfilled her gatekeeper duty by faxing Ms. Mata's EKG printout to a physician in accordance with the DOC protocol for chest pain.[136]

---

[133] *See id.* at 758.
[134] *Id.* at 750.
[135] *Id.* at 758.
[136] *Id.* at 760.

17

Similar to Nurse Weldon in *Mata*, a reasonable jury could find that PA Crockett completely refused to assess, treat, or diagnose Plaintiff's sore on his right foot. Defendants argue that Plaintiff did not present any case that demonstrates that PA Crockett must "exhaustively probe for every possible medical condition when performing an assessment."[137] But this assumes that PA Crockett was unaware of Plaintiff's medical condition. And as previously stated, a jury could choose to credit Plaintiff's testimony that he showed and discussed his sore with PA Crockett.

Defendants also argue that PA Crockett "examined Miller, diagnosed several medical conditions, prescribed several medications, and informed Miller to submit a Health Care Request with any additional medical concerns."[138] However, this is not true regarding Plaintiff's foot sore. PA Crockett did not examine the foot sore, diagnose it,[139] or prescribe medications for it. And a general statement to submit a Health Care Request to someone else does not constitute assessing, treating, or diagnosing Plaintiff's foot sore. Accordingly, at this stage, *Mata* provides sufficient notice that PA Crockett violated clearly established law if he chose not to examine or treat Plaintiff's foot sore. PA Crockett is not entitled to summary judgment.

### B.    Dr. Power Is Entitled to Qualified Immunity

#### 1.    *Constitutional Violation*

##### a.    Objective Component

The court has already concluded that Plaintiff's harm is a sufficiently serious injury under the objective prong.

---

[137] Defs.' MSJ 26.
[138] Defs.' MSJ Reply 16.
[139] PA Crockett simply noting prior diagnoses in Plaintiff's medical record is also not the same as personally diagnosing them.

b.  Subjective Component

i.  Knowledge of Substantial Risk

Plaintiff has presented sufficient evidence for a jury to conclude that Dr. Power recognized a substantial risk to Plaintiff's health. First, Dr. Power met with Plaintiff following ICRs, which informed Dr. Power of "a bad sore on [his] right foot that is very painful + red" and that Plaintiff is diabetic.[140] Second, upon examining Plaintiff's foot, Dr. Power saw an "open wound" that looked infected, stated the sore looked "old and advanced," "lacking recent dressings, recent cleanings" and presented with "an odor that was strong."[141] After treating it, Dr. Power also recognized the need to prescribe an antibiotic and dressing changes.[142] Dr. Power is also aware that in general, delaying an antibiotic could result in the "progression of an infected wound or a deterioration of the patient's overall condition."[143] Therefore, the knowledge element is met.

ii.  Disregard of Risk

Next, the Plaintiff must show that Dr. Power "consciously disregarded" a risk to the inmate's health or safety by failing to take reasonable measures to abate it.'"[144] "[A]ccidental or inadvertent failure to provide adequate medical care, or negligent diagnosis or treatment of a medical condition do not constitute" conscious disregard.[145]

A reasonable jury could not conclude that Dr. Power acted with disregard of a risk to Plaintiff's health or safety. Instead, unlike for PA Crockett, the uncontroverted evidence showed that Dr. Power provided substantial treatment to address Plaintiff's foot sore. Specifically, Dr.

---

[140] UDC Medical Records 1561.
[141] Power Dep. 19:11–21.
[142] *Id.* at 25:21–26:2.
[143] Power Dep. at 46:5–17.
[144] *Spradley*, 764 F. App'x at 699 (quoting *Martinez*, 563 F.3d at 1089).
[145] *Id.* (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)); *id.* at 700 ("'[A] medical professional['s] fail[ure] to treat a serious medical condition properly" is not conscious disregard.).

Power removed "sore, necrotic material or dead tissue" from the sore, cleansed it, applied an antibiotic, and redressed the sore.[146] Plaintiff testified that Dr. Power treated his foot for "[p]robably over an hour."[147]

Although Dr. Power failed to timely follow through with his stated intent to prescribe antibiotics,[148] this failure at most amounts to negligence or inadvertence, which does not meet the standard of deliberate indifference.[149] There is also no evidence in the record that Dr. Power purposely withheld antibiotics despite stating an intention to prescribe them. Accordingly, Dr. Power is entitled to qualified immunity.

### C.    Nurse Baker Is Entitled to Qualified Immunity

#### 1.  *Constitutional Violation*

##### a.  Objective Component

Viewing the evidence in the light most favorable to Plaintiff, on November 13, 2020, as a result of not getting treatment for his building hemiplegic migraine, Plaintiff had a hemiplegic migraine for a few days and had no use of the left side of his body for some of that time.[150] The court assumes without deciding that this is a sufficiently serious harm because Plaintiff cannot satisfy the subjective prong.

##### b.  Subjective Component

###### i.   Knowledge of Substantial Risk

It is undisputed that prior to November 13, 2020, Nurse Baker had never heard of a "hemiplegic migraine." Plaintiff told Nurse Baker he had been diagnosed with hemiplegic

---

[146] Power Dep. at 18:22–20:7.
[147] Miller Dep. 66:7–67:4.
[148] *See* Power Dep. 25:21–26:2.
[149] *Perkins v. Kansas Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999) ("A negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation.").
[150] Miller Dep. 95:16–24.

migraines, which could result in seizure-like symptoms, and that he needed a Toradol shot.[151] Nurse Baker's note referred to the condition as "hemodynamic Migraine vs. Stroke."[152] Due to hearing the word "stroke," Nurse Baker began evaluating Plaintiff for typical symptoms, such as whether he was slurring his speech, if he was able to walk, hold a conversation, and being alert and oriented.[153] Nurse Baker concluded he was not having a stroke but rather experiencing a migraine.[154] When Nurse Baker returned with migraine medication, although Plaintiff was initially slurring his speech, he then began to speak normally.[155] On these facts, a reasonable juror could not conclude that Nurse Baker knew of a substantial risk of serious harm.

### ii.    Disregard of Risk

Even if Nurse Baker had sufficient knowledge, a reasonable juror could not conclude that he disregarded a substantial risk of serious harm. Instead, upon hearing Plaintiff describe his medical condition—namely a form of migraine or stroke—Nurse Baker immediately assessed Plaintiff for symptoms of a stroke. After Nurse Baker ruled that out, he proceeded to order Plaintiff over-the-counter migraine medication, pick up the medication himself to get it to Plaintiff as soon as possible, submit an ICR for Plaintiff to see a doctor, and notify the charge nurse.[156] Additionally, Nurse Baker, as an RN, cannot prescribe Toradol. These actions cannot be described as being indifferent or disregarding Plaintiff's medical concerns. A reasonable jury might conclude that Baker was negligent for failing to suspend his responsibilities in the pill line and summon help more quickly for Plaintiff. But this is insufficient, standing alone, to establish deliberate indifference on this record. As such, Nurse Baker is entitled to qualified immunity.

---

[151] Baker Dep. 43:8–25; Miller Dep. 91:17–92:1, 92:23–93:6.
[152] Nov. 13 Medical Records 2396; Baker Dep. 51:11–22.
[153] Baker Dep. 51:8–54:11.
[154] *Id.*; Nov. 13 Medical Records 2396.
[155] Nov. 13 Medical Records 2396.
[156] Baker Dep. 53:21–54:5, 55:18–19, 68:1–13, 73:3–17; Nov. 13 Medical Records 2396.

## II.      CLAIMS TWO AND FOUR: UNNECESSARY RIGOR

Plaintiff argues that PA Crockett, Dr. Powers, Nurse Baker, and UDC violated the Unnecessary Rigor clause governed by Article I Section 9 of the Utah Constitution.[157] Defendants move for summary judgment, arguing that (1) Defendants committed no flagrant violation of Plaintiff's right to be free from unnecessary rigor; (2) existing remedies under § 1983 are sufficient to address Plaintiff's alleged injury; and (3) UDC does not have an official policy that caused the alleged violations and related injuries.[158] Plaintiff partially concedes that § 1983 provides an existing remedy, but only so long as the court finds the federal claim viable.[159] Accordingly, because the court concluded that Plaintiff's claim under § 1983 against PA Crockett survives summary judgment, the Unnecessary Rigor claim against him is dismissed.

### A.      Legal Standard

The Utah Supreme Court has held that the Unnecessary Rigor clause "'protects [prisoners and arrestees] against unnecessary abuse . . . that is 'needlessly harsh, degrading or dehumanizing . . . .'"[160] To state a claim for a violation of the Unnecessary Rigor clause, the violation "must arise from 'treatment that is clearly excessive or deficient and unjustified, not merely the frustrations, inconveniences, and irritations that are common to prison life.'"[161] "When the claim of unnecessary rigor arises from an injury, a constitutional violation is made out only when the act complained of presented a substantial risk of serious injury for which there was no reasonable justification at the time."[162] Like deliberate indifference, unnecessary rigor is "difficult . . . to prove."[163]

---

[157] FAC ¶¶ 124–32, 142–49.
[158] Defs.' MSJ 28–39.
[159] Pl.'s Opp'n to MSJ 26.
[160] *Dexter v. Bosko*, 184 P.3d 592, 595 (Utah 2008) (quoting *Bott v. Deland*, 922 P.2d 732, 737 (Utah 1996)).
[161] *Id.* at 597 (quoting *Bott*, 922 P.2d at 741).
[162] *Id.*
[163] *See Bott*, 922 P.2d at 744.

To show a violation, a plaintiff must establish: (1) the plaintiff "suffered a 'flagrant' violation of his or her constitutional rights"; (2) "existing remedies do not redress [the plaintiff's] injuries"; and (3) "equitable relief, such as an injunction, was and is wholly inadequate to protect the plaintiff's rights or redress his or her injuries."[164] Only the first two factors are in dispute.

### 1. Flagrant Violation

To show that plaintiffs have suffered a "flagrant" violation of their constitutional rights, they must demonstrate "that a defendant must have violated 'clearly established' constitutional rights 'of which a reasonable person would have known.'"[165] This standard uses identical language as the standard for qualified immunity—"[t]o be considered clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"[166]

To prove a flagrant violation, the plaintiff must demonstrate that "the nature of the act presents an obvious and known serious risk of harm to the arrested or imprisoned person" and "knowing of that risk, the official acts without other reasonable justification."[167] The court reaches the same conclusions regarding a flagrant violation as it did in deciding whether Dr. Power and Nurse Baker were protected under qualified immunity.[168]

First, as discussed regarding the first prong of qualified immunity, a reasonable jury could find that Dr. Power's failure to provide antibiotics presented an obvious and known serious risk of harm to the Plaintiff.[169] But Plaintiff has not presented sufficient evidence to for a reasonable juror to conclude that Dr. Power acted without reasonable justification in failing to

---

[164] *Spackman ex rel. Spackman v. Bd. of Educ. of Box Elder Cnty. Sch. Dist.*, 16 P.3d 533, 538–39 (Utah 2000).
[165] *Id.* at 538 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).
[166] *Porter v. Daggett Cnty., Utah*, 587 F. Supp 3d 1105, 1127 (D. Utah 2022) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639–40 (1987)).
[167] *Dexter*, 184 P.3d at 598.
[168] The parties also provide substantively similar arguments in addressing qualified immunity and whether the individual defendants committed a flagrant violation. *See* Defs.' MSJ 29–31; Pl.'s Opp'n to MSJ 25–26.
[169] *See* UDC Medical Records 1561; Power Dep. 19:11–21, 25:21–26:2, 46:5–17.

timely prescribe antibiotics. There is no record evidence that Dr. Power purposely withheld antibiotics despite stating an intention to prescribe them. As the Utah Supreme Court has explained, "[t]he requirement that the unconstitutional conduct be 'flagrant' ensures that a government employee is allowed the ordinary 'human frailties of forgetfulness, distractibility, or misjudgment without rendering [him or her]self liable for a constitutional violation.'"[170] Mere negligence is insufficient.[171] Therefore, Dr. Power is entitled to summary judgment.

Second, a reasonable jury could not find that Nurse Baker committed a flagrant violation of Plaintiff's constitutional right to be free from unnecessary rigor. The record evidence demonstrates that Nurse Baker did not recognize a serious risk of harm to Plaintiff, particularly given that he had never heard of a hemiplegic migraine and ruled out a stroke. Further, Nurse Baker could not provide Plaintiff with a Toradol shot, but did provide migraine medication, submit an ICR for Plaintiff to see a doctor, and notify the charge nurse.[172] Nurse Baker's failure to provide additional care based on his limited knowledge of Plaintiff's hemiplegic migraine could potentially be seen as negligent or misjudgment but is certainly not a flagrant violation of Plaintiff's constitutional right. Therefore, Nurse Baker is entitled to summary judgment.

### 2. UDC Liability

Plaintiff could not bring suit against UDC, a state governmental entity, under § 1983. Therefore, the court separately considers whether UDC violated the Unnecessary Rigor clause.

### a. Sovereign Immunity

Defendants argue that UDC is entitled to sovereign immunity. Sovereign immunity precludes lawsuits against state governmental entities without the state's consent.[173] "[I]n the

---

[170] *Spackman*, 16 P.3d at 538.
[171] *Dexter*, 184 P.3d at 597.
[172] Nov. 13 Medical Records 2396.
[173] *Nicholas v. Att'y Gen.*, 168 P.3d 809, 811 (Utah 2007); *Tiede v. State*, 915 P.2d 500, 504 (Utah 1996).

absence of either express constitutional or statutory authority," sovereign immunity bars claims against the State.[174]

There is no textual constitutional right to damages for one who suffers a violation of the Unnecessary Rigor Clause of the Utah Constitution.[175] Nor has the legislature enacted any laws authorizing damage claims for constitutional violations in general.[176] Accordingly, monetary damages awarded for violation of a self-executing constitutional provision—such as the Unnecessary Rigor Clause—are based in common law.[177]

Plaintiff argues that sovereign immunity does not bar his suit against UDC because Plaintiff has "the right to enforce self-executing clauses of the Utah Constitution against the State."[178] In support, Plaintiff primarily relies on *Colman v. Utah State Land Board*,[179] where the Utah Supreme Court held that state is not immune from suit under the Takings Clause of the Utah Constitution,[180] a self-executing provision.[181]

Yet, there is a key distinction between the Takings Clause and the Unnecessary Rigor Clause. Unlike the Unnecessary Rigor Clause, the Takings Clause explicitly includes a textual constitutional right to damages. Specifically, the Takings Clause states, "Private property shall not be taken or damaged for public use *without just compensation*."[182] The Unnecessary Rigor

---

[174] *Tiede*, 915 P.2d at 504 (quoting *Wilkinson v. State*, 42 Utah 483, 492–93 (Utah 1913)).
[175] *See Spackman*, 16 P.3d at 537 ("Except for the Takings Clause, the Utah Constitution does not expressly provide damage remedies for constitutional violations.").
[176] *Id.*
[177] *See id.* at 537–38. "The Utah Supreme Court has determined that the unnecessary rigor clause contained in Article I, Section 9 of the Utah Constitution 'is a self-executing provision.'" *Christensen v. Salt Lake Cnty.*, 510 P.3d 299, 307 n.7 (Utah App. 2022) (citing *Bott*, 922 P.2d at 737).
[178] Pl.'s Opp'n to MSJ 27 (citing *Colman v. Utah State Land Bd.*, 795 P.2d 622, 634 (Utah 1990)).
[179] 795 P.2d 622, 634 (Utah 1990)).
[180] Utah Const. art. I, § 24.
[181] *Colman*, 795 P.2d at 635; *see also* Utah Governmental Immunity Act, Utah Code § 63-30-10.5 (waiving immunity for taking private property without compensation). Defendants' observation that the state was not a defendant in *Colman* is irrelevant, as the court held "that the State is not immune" in determining that the State's contractor cannot depend on the State's immunity. *Colman*, 795 P.2d at 635.
[182] Utah Const. art. I, § 24 (emphasis added).

Clause does not explicitly direct damages for violations, instead stating, "Persons arrested or imprisoned shall not be treated with unnecessary rigor."[183]

In line with this distinction, the Utah Supreme Court in *Spackman* stated, "*aside from the Takings Clause*, there is no textual constitutional right to damages for one who suffers a constitutional tort."[184] The court then concluded that "a Utah court's ability to award damages for violation of a self-executing constitutional provision rests on the common law."[185] Awards of damages arising under the common law are insufficient to overcome sovereign immunity, absent either express constitutional or statutory authority, neither of which exist here.[186] Accordingly, UDC has not "clearly and unequivocally waived sovereign immunity."[187]

Plaintiffs also cite to *Bott v. DeLand*,[188] where the Utah Supreme Court concluded that the violation of self-executing constitutional provisions, including the Unnecessary Rigor clause, allows for awards of money damages.[189] There, the court stated that "governmental immunity cannot apply where a claimant alleges that the state or a state employee violated his constitutional rights."[190] However, when the Utah Supreme Court in *Spackman* determined "there is no textual constitutional right to damages for one who suffers a constitutional tort," it

---

[183] Utah Const. art. I, § 9.

[184] *Spackman ex rel. Spackman v. Bd. of Educ. of Box Elder Cnty. Sch. Dist.*, 16 P.3d 533, 537 (Utah 2000) (emphasis added).

[185] *Id.* 538; *see also Harvey v. Ute Indian Tribe of Uintah & Ouray Rsrv.*, 416 P.3d 401, 426 (Utah 2017) ("[A] self-executing constitutional provision does not necessarily give rise to a damages suit.") (quoting *Spackman*, 16 P.3d at 537).

[186] *DeBry v. Noble*, 889 P.2d 428, 439 (Utah 1995) ("Beginning with *Wilkinson v. State*, 42 Utah 483, 134 P. 626 (1913), the Court flatly declared that tort actions against the state could not be maintained without statutory authorization, even though the whole immunity doctrine was court created."); *Tiede*, 915 P.2d at 504 ("[I]n the absence of either express constitutional or statutory authority an action against a sovereign state cannot be maintained.") (quoting *Wilkinson*, 134 P. 626, 630 (Utah 1913)); *see also P.J. ex rel. Jensen v. Utah*, No. 2:05-cv-00739-PGC, 2006 WL 1702585, at *3 (D. Utah June 16, 2006) (finding plaintiffs' claims against the State for violations of Utah constitutional provisions were barred by sovereign immunity).

[187] *Harvey*, 416 P.3d at 412.

[188] 922 P.2d 732.

[189] *Id.* at 739.

[190] *Id.* at 736.

specifically "disavow[ed] any statements in *Bott* that might suggest otherwise."[191] Additionally, *Bott* interprets the statutory immunity found in the Governmental Immunity Act, which "does not apply to constitutional claims."[192]

Finally, Plaintiffs argue that, based on the court's prior ruling on UDC's motion to dismiss,[193] "[UDC] is barred by the law of the case from re-raising this argument."[194] However, "the 'law of the case' doctrine is not an inexorable command, but only a rule of practice in the courts and not a limit on their power."[195] Therefore, the court declines to apply the doctrine and concludes that Counts 2 and 4 against UDC are barred by sovereign immunity.

## III.    CLAIM FIVE: RETALIATION

Plaintiff alleges that Nurse Baker retaliated against Plaintiff for exercising his right to file a lawsuit against other prison officials by failing to administer a Toradol shot for his hemiplegic migraine and for refusing to assess Plaintiff.[196] Defendants move for summary judgment, arguing that Plaintiff cannot establish a retaliatory motive for the refusal to provide a Toradol injection because Plaintiff did not have an active prescription for Toradol at the time of the alleged retaliation and Nurse Baker cannot prescribe it.[197] In response, Plaintiffs point to circumstantial evidence, contending that "Baker refused to assess [Plaintiff], refused to communicate with a provider, and refused to take him to medical even after showing symptoms of paralysis."[198] Further, Plaintiff argues that his ongoing litigation against other members of prison medical staff,

---

[191] *Spackman*, 16 P.3d at 537.
[192] *Bott*, 922 P.2d at 736–40; *Pinder v. Duchesne Cnty. Sheriff*, 478 F.3d 610, 623 n.9 (Utah 2020).
[193] Mem. Decision & Order on Mots. to Dismiss, ECF No. 20, filed March 30, 2021.
[194] Pl.'s Opp'n to MSJ 29.
[195] *United States v. Trent*, 884 F.3d 985, 994 n.9 (10th Cir. 2018) (cleaned up).
[196] FAC ¶¶ 150–161.
[197] Defs.' MSJ 40.
[198] Pl.'s Opp'n to MSJ 32.

Plaintiff's reputation for being litigious, and Plaintiff's use of a curse word directed to Nurse Baker support an inference of a retaliatory motive.[199]

### B.    Legal Standard

Prison officials may not retaliate against or harass an inmate because of the inmate's exercise of his right of access to the courts.[200] "'This principle applies even where the action taken in retaliation would otherwise be permissible.'"[201] A retaliation claim requires the plaintiff to show that (1) he was engaged in constitutionally protected activity, (2) the government's actions caused him injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the government's actions were substantially motivated as a response to his constitutionally protected conduct.[202]

A plaintiff must show a causal connection between a defendant's retaliatory animus and subsequent injury.[203] A causal connection may be inferred by "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."[204] Temporal proximity, without more, is insufficient to show a retaliatory motive.[205]

---

[199] *Id.* at 32–33.
[200] *Gee v. Pacheco*, 627 F.3d 1178, 1189 (10th Cir. 2010) (quoting *Smith v. Maschner*, 899 F.2d 940, 947 (10th Cir. 1990)).
[201] *Ortiz v. Torgeson*, 857 F. App'x 419, 428-29 (10th Cir. 2021) (quoting *Smith*, 899 F.2d at 948).
[202] *Nielander v. Bd. of Cty. Comm'rs*, 582 F.3d 1155, 1165 (10th Cir. 2009) (citing *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000)); *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007).
[203] *Hartman v. Moore*, 547 U.S. 250, 259 (2006) (in dicta) (citing *Crawford-El v. Britton*, 523 U.S. 574, 593 (1998)).
[204] *Burrus v. United Tel. Co.*, 683 F.2d 339, 343 (10th Cir. 1982) (finding that a gap of almost three years between the protected activity and the alleged retaliation failed to establish a prima facia case of retaliation).
[205] *Branham v. Workman*, No. 05-6222, 2006 U.S. App. LEXIS 9479, at *15 (10th Cir. Apr. 13, 2006) (rejecting a claim that disciplinary action filed five days after an inmate filed a writ of mandamus was sufficient evidence of a retaliatory motive); *Flemming v. Corrections Corp. of America*, 143 Fed. App'x 921, 924 (10th Cir. 2005) ("even considering the temporal proximity, . . . no reasonable jury would find that [defendant] would not have taken either of the complained-of actions 'but for' [the inmate's] invocation of his rights.").

### C.    Analysis

The undisputed evidence demonstrates that although Plaintiff requested a Toradol shot, Plaintiff did not have a prescription for it at the time.[206] Additionally, Nurse Baker, as an RN, cannot prescribe a Toradol shot.[207]

Once Defendants have shown the absence of evidence to support a material element of Plaintiff's claim, the burden shifts to Plaintiff to identify admissible evidence establishing a genuine dispute.[208] Plaintiff argues that "[c]onsidering the ongoing litigation, and Miller's reputation as being litigious amongst medical staff, Miller has presented sufficient evidence to connect a retaliatory animus with his deficient care."[209] Plaintiff further argues that "[a] jury could also find that Baker retaliated against [Plaintiff] for using a curse word."[210] None of this circumstantial evidence suffices to establish a causal connection between Nurse Baker's actions and Plaintiff's constitutionally protected conduct, particularly when Nurse Baker, under any set of facts or mindset, could not provide Plaintiff with a Toradol shot.

Additionally, following Nurse Baker's assessment of Plaintiff—where he ruled out symptoms of a stroke—he proceeded to order Plaintiff over-the-counter migraine medication, pick up the medication himself to get it to Plaintiff as soon as possible, submit an ICR for Plaintiff to see a doctor, and notify the charge nurse.[211] Further, Plaintiff's own statement of material facts cites the declaration of Plaintiff's fellow inmate, Jeff Batty.[212] The cited portion of Mr. Batty's declaration states that Nurse Baker told Plaintiff:

---

[206] Migraine Scripts 2225, ECF No. 82-7, filed July 31, 2024.
[207] Olsen Decl. ¶¶ 6–7, 27, 29.
[208] *See Hartman v. Moore*, 547 U.S. at 259 (in dicta); *Nielander v. Bd. of Cty. Comm'rs*, 582 F.3d at 1165; *Shero v. City of Grove*, 510 F.3d at 1203.
[209] Pl.'s Opp'n to MSJ 32–33.
[210] *Id.* at 33.
[211] Baker Dep. 53:21–54:5, 55:18–19, 68:1–13, 73:3–17; Nov. 13 Medical Records 2396.
[212] Pl.'s Opp'n to MSJ 12 (citing Batty Decl. at JM 2145, ECF No. ).

Baker states that the medical provider will be notified of symptoms. Medical provider will then determine based on visual observations of medical technician whether or not inmate's condition warrant[s] further action. . . . [Baker] states that the decision to transport inmate Miller to the hospital lies solely upon the medical provider.[213]

Accordingly, based on Nurse Baker's conduct and limitations as an RN, as well as the fact that the medical provider would determine whether Plaintiff needs further treatment, a reasonable juror could not conclude that he retaliated against Plaintiff due to Plaintiff's constitutionally protected conduct.

Plaintiff's general citation to *Smith v. Maschner*[214] to support his claim that Plaintiff's reputation and ongoing litigation justify the inference that Baker acted with retaliatory motive bears little relevance. In *Smith*, the plaintiff supported his allegations of retaliation through an array of circumstantial evidence of the suspicious timing of his discipline, coincidental transfers of his witnesses and assistants, and an alleged pattern by defendants of blocking his access to legal materials and assistance:

Smith's appearance in court, a protected activity, and the prison's disciplinary action, taken immediately upon his return from court, were indisputably in close temporal proximity. Smith presented evidence that prison officials had never before questioned him about his briefcase, the primary subject of his disciplinary proceedings. In spite of his prior good record, Smith was punished with a sizeable loss of good time credits. In addition, Smith presented an affidavit by fellow inmate Thomas Chappell that asserted officials intentionally segregated and then transferred Chappell to prevent his being a witness in a pending lawsuit by Smith. Smith alleged this type of interference occurred on other occasions as well, and that officials denied him his law files, papers, and books while he himself was in segregation. Smith submitted an affidavit by Craig Bryant, a prison law clerk, that prison officials removed Mr. Bryant from library employment in retaliation for assisting Smith while he was in segregation.[215]

In contrast to the voluminous evidence adduced in *Smith*, the only other evidence Plaintiff cites to support the inference that Baker acted with a retaliatory motive is Plaintiff's

---

[213] Batty Decl. at JM 2145.
[214] 899 F.2d 940, 948 (10th Cir. 1990).
[215] *Id.* at 948.

reputation for being litigious. Plaintiff's statement of material facts cites the following testimony

from Nurse Baker for the proposition that Plaintiff had a reputation among medical staff for

being litigious:

> I never had any problems with Miller before I left. I mean, he even told me, hey,
> you're in one of my lawsuits. And I'm, like, well, that's good that I'm only in one.
> He did have a reputation for being litigious, I guess you'd call it, where he had,
> you know, more than one lawsuit going against more than one person.[216]

The record does not make clear when Plaintiff filed the lawsuits (plural) that Nurse Baker

referred to as the basis for Plaintiff's reputation. Even assuming that on November 13, 2020,

Nurse Baker was aware of Plaintiff's reputation for being litigious, Plaintiff's circumstantial

evidence that Baker acted with retaliatory intent falls far below the standard set by *Smith*.

Additionally, although temporal proximity, by itself, is insufficient to show a retaliatory

motive,[217] the Tenth Circuit in *Smith* noted that "a protected activity, and the prison's

disciplinary action, taken *immediately* upon [plaintiff's] return from court, were indisputably in

close temporal proximity."[218] In contrast, the instant lawsuit was filed in state court in January

2020, approximately 10 months prior to the alleged retaliation.[219]

Plaintiff's conclusory arguments, some of which are contradicted by the evidence on the

record, the lack of temporal proximity between Plaintiff's lawsuit and Nurse Baker's alleged

retaliation, and Plaintiff's reputation for being litigious are insufficient to support an inference

that Nurse Baker acted out of retaliatory animus. Further, Plaintiff offers no fact to contradict the

evidence that Nurse Baker refused to supply a Toradol injection because he did not have a

---

[216] Baker Dep. 46:4–12.

[217] *Branham v. Workman*, No. 05-6222, 2006 U.S. App. LEXIS 9479, at *15 (10th Cir. Apr. 13, 2006) (rejecting a claim that disciplinary action filed five days after an inmate filed a writ of mandamus was sufficient evidence of a retaliatory motive); *Flemming v. Corrections Corp. of America*, 143 Fed. App'x 921, 924 (10th Cir. 2005) ("even considering the temporal proximity, . . . no reasonable jury would find that [defendant] would not have taken either of the complained-of actions 'but for' [the inmate's] invocation of his rights.").

[218] *Smith*, 899 F.2d at 948 (emphasis added).

[219] *See* Docket Report, Case no. 200900442 (Utah 3d Dist. Jan. 16, 2020) (ECF No. 5, at 1).

prescription on November 13, 2020. As such, Plaintiff fails to establish a genuine dispute that Nurse Baker's actions on November 13 were substantially motivated by retaliatory animus. Defendants' motion to dismiss Plaintiff's fifth cause of action must therefore be granted.

## ORDER

Accordingly, the court GRANTS IN PART Defendants' motion for summary judgment.[220] The court GRANTS the motion as to Defendants PA Merrill, Nurse Lee, Dr. Power, Nurse Baker, and UDC. The court GRANTS IN PART and DENIES IN PART the motion as to PA Crockett. The court DENIES AS MOOT Defendants' motion to exclude Plaintiff's Expert, Dr. Zawitz,[221] with leave to refile if the case proceeds to trial.

Signed May 7, 2025.

BY THE COURT

_____
David Barlow
United States District Judge

---

[220] ECF No. 80.
[221] ECF No. 89.